# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF KENTUCKY
# ASHLAND DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| Coal Network, LLC, | ) Case No. 22-10098-tnw |
| Reorganized Debtor. | ) Hon. Tracey N. Wise |

## THE REORGANIZED DEBTOR'S OBJECTION TO CLAIM
## OF CEMEX CONSTRUCTION MATERIALS ATLANTIC, LLC [CLAIM NO. 15]

Coal Network, LLC (the "Reorganized Debtor" or "Coal Network"), by and through its undersigned counsel, hereby files this objection (the "Objection") to Claim No. 15 (the "Claim") of CEMEX Construction Materials Atlantic, LLC ("CEMEX") under section 502 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## JURISDICTION AND VENUE

1.   The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**I.   Coal Network's Relationship with CEMEX**

2.   Coal Network operates as an energy solutions provider, specializing in the trade of coal and blended coal products for the thermal, industrial, metallurgical markets. [Docket No. 24, ¶ 6.] Coal Network enters into contracts with customers to procure coal and arrange for shipping and logistics. [*Id.* at ¶ 7.]

3.   On or about June 3, 2020, Coal Network and CEMEX entered into a certain Coal

23223211.v4

Supply Agreement (the "CEMEX Agreement"), attached hereto as **Exhibit A**, for Coal Network to supply CEMEX with a certain amount of coal at $60.00 per short ton, plus a $15.00 freight price per ton, as provided under section 2.1 of the CEMEX Agreement.

4. When CEMEX entered into the agreement with Coal Network, CEMEX was aware that Coal Network did not itself mine coal but was entering into a separate supply agreement with a miner to obtain the supply. As indicated in the CEMEX Agreement, Coal Network only entered into the CEMEX Agreement after it had negotiated the price and quantity with the supplier.

5. Accordingly, on June 3, 2020, Coal Network and Firestar Energy, LLC ("Firestar") entered into a certain Coal Supply Agreement (the "Firestar Agreement"), attached hereto as **Exhibit B**, for Firestar to directly deliver coal of the quality and quantity described in the Firestar Agreement to CEMEX.

6. The CEMEX Agreement and Firestar Agreement are governed by Tennessee Law. CEMEX Agreement, § 16.1; Firestar Agreement, § 16.1.

7. CEMEX was aware of the Firestar Agreement. In addition to the negotiations prior to executing the CEMEX Agreement, post-agreement, Firestar delivered the coal directly to CEMEX.

8. Around August 2021, Firestar began decreasing its supply and quality of coal to CEMEX. Firestar would not continue supplying coal under the Firestar Agreement because it was losing a significant amount of money on the contract. As shown in the chart below, coal prices had spiked significantly and were forecasted to continue to rise. Upon information and belief, the increased prices in coal from 2020 to 2021 made the Firestar Agreement unattractive for Firestar to fulfill its obligations.

23223211.v4



Source: IEA (2022), Coal Market Update - July 2022 https://www.iea.org/reports/coal-market-update-july-2022

9.     Eventually, Firestar stopped all deliveries in direct breach of the Firestar Agreement.

10.    When Coal Network learned of Firestar's breach, Coal Network immediately began searching for alternate sources of supply to fulfil the amounts under the CEMEX Agreement. However, the dramatic increased price of coal made it impossible for Coal Network to secure coal supplies. Coal Network provided notice to CEMEX of the issues with locating supplies and worked with CEMEX for several months to try to find alternatives while continuing to try to persuade Firestar to fulfill its contract obligations. However, the CEMEX Agreement provided that Coal Network could not supply coal from any other source without being approved by CEMEX. *See* CEMEX Agreement, § 1.2.

11.    On January 4, 2022, CEMEX sent a notice of default and intent to terminate to Coal Network (the "CEMEX Default Notice"), attached hereto as **Exhibit C**, for failure to supply CEMEX with coal that met the specifications in the CEMEX Agreement. CEMEX provided Coal

Network 60 days to cure the default under section 14.1 of the CEMEX Agreement, as well as 30 days to provide adequate assurance of due performance.

12. Simultaneously, on January 4, 2022, Coal Network sent a notice of default to Firestar (the "Firestar Default Notice"), attached hereto as **Exhibit D**, for failure of Firestar to supply CEMEX with coal that met the specifications in the Firestar Agreement.

13. On January 27, 2022, CEMEX notified Coal Network that under section 7.3 of the CEMEX Agreement, it would begin withholding payments. CEMEX withheld $984,870.25 in payments due to Coal Network. Coal Network disputed that the withholding was proper under the terms of the CEMEX Agreement, most significantly because CEMEX started withholding payments to Coal Network that were outside the scope of the CEMEX Agreement but associated with other, unrelated agreements between the parties.

14. During the dispute, Coal Network continued to attempt to negotiate alternative supply terms with CEMEX but CEMEX declined any alternative terms. *See* emails attached hereto as **Exhibit E**. Instead, as indicated in the Claim, CEMEX purchased replacement coal at a higher price than found and offered by Coal Network. *See, e.g.*, Claim Attachment, pp. 37, 44, 59, 67, 86 and 89.

## II. The Chapter 11 Case

15. On August 17, 2022 (the "Petition Date"), Coal Network filed a voluntary petition for relief under subchapter V of chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of Kentucky (the "Bankruptcy Court"), thereby commencing the above-captioned bankruptcy case (the "Chapter 11 Case").

16. On August 18, 2022, the Court entered the *Order Setting Status Conference and Other Deadlines in Subchapter V Case* [Docket No. 25], which set the deadline for creditors (other

than governmental units) to file proofs of claim as October 26, 2022 (the "General Bar Date"). The deadline for governmental units to file proofs of claim was February 13, 2023 (the "Governmental Bar Date").

17. On October 26, 2022, CEMEX filed its Claim in the amount of $3,881,525.18 for damages under the CEMEX Agreement. The amount of CEMEX's Claim includes the **total** amount of replacement coal ($4,851,221.53), *plus* attorney's fees ($15,127.50), *plus* expenses ($46.40), *minus* unpaid Coal Network invoices ($984,870.25).

18. To be clear, CEMEX's Claim includes its entire purchase price of coal, not just the difference in price between the CEMEX Agreement and any replacement coal, but the entire purchase price of the replacement coal.

### III.  Confirmation of the Plan

19. On November 15, 2022, Coal Network filed the *Debtor's Subchapter V Small Business Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code* [Docket No. 211] (as amended, the "Plan").

20. The Court entered an order confirming the Plan on January 12, 2023 [Docket No. 277] (the "Confirmation Order").

21. On January 12, 2023, the Reorganized Debtor—through counsel—began having conversations with counsel for CEMEX putting CEMEX on notice that (i) Coal Network had an absolute defense under the CEMEX Agreement, (ii) the Claim calculation was inflated because it included all coal purchases and not the difference in purchase price, and (iii) part of the Claim was outside the scope of the CEMEX Agreement. However, no resolution was ever reached, and CEMEX has failed to adjust its Claim.

22. Under section 5.01 of the Plan, the Reorganized Debtor reserved the right to object to any claims filed "for one year, or until the first claim is first scheduled for a distribution, whichever date is later." Plan, § 5.01.

## RELIEF REQUESTED

23. By this Objection, the Reorganized Debtor seeks disallowance of the Claim under section 502(b)(1) because (i) the force majeure clause in the CEMEX Agreement and section 47–2–615 of the Tennessee Code excused Coal Network from performance, and (2) CEMEX's Claim does not include adequate supporting documentation related to cover damages or an itemized schedule of fees and expenses as required by Bankruptcy Rule 3001.

24. In the alternative, if the Court finds that CEMEX's Claim should not be fully disallowed under section 502(b)(1), the Claim should be reduced to (i) include a proper calculation of cover damages under section 47–2–712(2) of the Tennessee Code pursuant to section 502(b)(1) of the Bankruptcy Code, and (ii) remove attorneys' fees and costs.

25. Additionally, CEMEX was made aware that its calculations were overstated, yet has refused to amend the Claim; therefore, the Reorganized Debtor should be allowed to offset its attorneys' fees in having to file this Objection.

## BASIS FOR RELIEF

**I.  CEMEX's Claim Should Be Disallowed Under Section 502(b)(1) of the Bankruptcy Code Pursuant to the Force Majeure Clause of the CEMEX Agreement and Section 47–2–615 of the Tennessee Code.**

26. CEMEX's Claim should be disallowed in its entirety under section 502(b)(1) of the Bankruptcy Code because Coal Network, through no fault of its own, could not supply the coal as specified in the CEMEX Agreement. CEMEX was aware that the Production Location (*i.e.*, Firestar), as defined in the CEMEX Agreement, refused to supply the coal that was specified in

the agreement. CEMEX was further aware that the increased demand for coal and corresponding price increases made it impossible for Coal Network to supply the specified coal under the agreement.

27. Such circumstances were contemplated under section 9 of the CEMEX Agreement. This was not a case where Coal Network failed to supply coal because it was preferring another customer or because it was unable to afford transport, or any other variable under its control as contemplated under section 2 of the CEMEX Agreement. Coal Network simply had no ability to supply CEMEX with the coal from the Production Location as specified in the CEMEX Agreement.

28. Section 502 of the Bankruptcy Code provides that if an objection to a claim is filed,

> [T]he court, after notice and a hearing, shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . . such claim is unenforceable against the debtor and property of the debtor, **under any agreement or applicable law** for a reason other than because such claim is contingent or unmatured . . . ."

11 U.S.C. § 502(b)(1) (emphasis added).

29. The Claim is unenforceable against the Reorganized Debtor because Coal Network was excused from performance under section 9 of the CEMEX Agreement. Section 9 covers events constituting force majeure and consequences of such events:

> **9.1   Events of Force Majeure.** If because of Force Majeure . . . either Party is unable, in whole or in part, to carry out any of its obligations under this Agreement, and if such Party promptly gives notice to the other Party of such Force Majeure . . ., then the obligations of the Party giving such notice are suspended to the extent and for the period made reasonably necessary by such Force Majeure . . .; provided, however, that the notifying Party proceeds with all reasonable dispatch to remedy, if possible, the cause of such Force Majeure. . . .

7

> As used herein, "Force Majeure" shall mean any event or cause beyond the reasonable control of a Party that cannot be prevented or eliminated by the exercise of due diligence including but not limited to . . . inability to secure supplies, . . . not the fault of the Party claiming under the Section, interruption or shortage of transportation arrangements or equipment or any other cause of the kind herein enumerated.
>
> . . .
>
> **9.2    Suspension of Performance for Force Majeure or Environmental Force Majeure.** If a condition for Force Majeure . . . occurs, the mutual obligations of both Parties arising out of the event of Force Majeure . . . shall be suspended to the extent caused by the event.

CEMEX Agreement, §§ 9.1 and 9.2.

30. Tennessee law further supports denial of the Claim. "Tennessee contract law requires courts to construe the language of a contract in its plain, ordinary, or popular sense." *DR Ent., LLC v. Blue Moon Ent., LLC,* No. 3:21-CV-817, 2022 WL 2981425, at *4 (M.D. Tenn. June 29, 2022), report and recommendation adopted, No. 3:21-CV-00817, 2022 WL 2975307 (M.D. Tenn. July 27, 2022) (citations omitted). "The plain and ordinary construction of the 'Force Majeure' clause is that a party would not be in breach for nonperformance if any of the listed events occurred . . . ." *Id.* (holding that a country music artist was exempt from performance under the force majeure clause of a booking contract because of sickness, which the Court held was out of his control).

31. Further, section 47–2–615 of the Tennessee Code, codifying the Uniform Commercial Code (the "UCC"), provides that the seller is excused "if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made . . . ." T.C.A. § 47–2–615(a).

32. Nothing in the applicable statutes prevents a contracting party from consciously assuming the risk of a particular contingency. *See generally, Teco Coal Corp. v. Orlando Utils.*

8

*Comm'n*, No. 6:07–CV–444–KKC, 2010 WL 8750622, at *9 (E.D. Ky. Sept. 17, 2010) (discussing a seller's assumption of the risk in the context of a claim of commercial impracticability under KRS § 355.2-615, which mirrors T.C.A. § 47–2–615 and the UCC); *see also Cohen v. North Ridge Farms, Inc.*, 712 F. Supp. 1265, 1270–71 (E.D. Ky. Mar. 29, 1989) (noting that it is possible for a party to a contract to assume the risk of every chance occurrence). Such a provision shifts the risk of loss to the buyer irrespective of any express or implied warranties. *See Roberts v. Lanigan Auto Sales*, 406 S.W.3d 882, 884–85 (Ky. Ct. App. 2013).

33. Here, CEMEX was aware that the Production Location refused to supply coal to CEMEX under the Firestar Agreement. CEMEX was in consistent communication with Coal Network regarding the issue and rejected Coal Network's offers to find alternatives. *See* Exhibit E. In fact, in the parties' correspondence, CEMEX routinely was the party that informed Coal Network that Firestar was not supplying the requisite coal. *See id*.

34. Firestar's breach of the Firestar Agreement made performance by Coal Network impossible, but certainly impractical, under the CEMEX Agreement and section 47–2–615 of the Tennessee Code. CEMEX could have included language in the CEMEX Agreement that would have protected it against any actions by Firestar, but it did not. Because CEMEX agreed to assume the risk of Firestar supplying inferior or a lower quantity of coal, the provisions of the CEMEX Agreement and section 47–2–615 of the Tennessee Code excused Coal Network from performance and preclude CEMEX as a matter of law from recovering any damages allegedly related to Firestar's refusal to supply it coal. CEMEX Agreement, § 9.2; T.C.A. § 47–2–615(a).

35. Because CEMEX's Claim includes the total cost of replacement coal and attorneys' fees and costs, and these costs were the direct result of force majeure outside Coal Network's

control, the Reorganized Debtor is not responsible for such costs under the plain terms of the CEMEX Agreement.

36.     Therefore, the Claim is unenforceable against the Reorganized Debtor under section 502(b)(1) because the force majeure clause of the CEMEX Agreement suspended performance and section 47–2–615 of the Tennessee Code provides that Coal Network's actions were not a breach because of impossibility and impracticability.

II.     **In the Alternative, CEMEX's Claim Should be Disallowed Because CEMEX Did Not Comply with the Filing Requirements of Bankruptcy Rule 3001.**

37.     If the Court finds that performance by Coal Network was not excused, CEMEX's Claim should still be disallowed because the Claim does not include adequate supporting documentation as required by Bankruptcy Rule 3001 and includes grossly inflated damages that do not comply with Tennessee law.

38.     Bankruptcy Rule 3001 provides that "[i]f . . . a claim includes interest, fees, expenses, or other charges incurred before the petition was filed, an itemized statement of the interest, fees, expenses, or charges shall be filed with the proof of claim." FED. R. BANKR. P. 3001(c)(2)(A). "If the holder of a claim fails to provide any information required by this subdivision (c), the court may . . . (i) preclude the holder from presenting the omitted information, in any form, as evidence in any contested matter . . . unless the court determines that the failure was substantially justified or is harmless; or (ii) award other appropriate relief, including reasonable expenses and attorney's fees caused by the failure." *Id.* at 3001(c)(2)(D).

39.     Section 47–2–715 of the Tennessee Code provides that a buyer can recover incidental damages resulting from a seller's breach only if the incidental damages are "commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." T.C.A. § 47–2–715(1).

40. CEMEX's Claim should be disallowed because it failed to file with its proof of claim the requisite information and supporting documentation to support its claim and **attempted to inflate its claim by millions of dollars**, as put forth in detail below.

41. In support of its Claim, CEMEX uploaded all of its invoices for coal it allegedly purchased that CEMEX would have purchased from Coal Network under the agreement. CEMEX included the **total** price of the replacement coal in its damages calculation, not just the difference between the price of the replacement coal and the price of the coal it would have paid under the CEMEX Agreement. *See* T.C.A. § 47–2–712(2). Additionally, the invoices reflect over one hundred thousand dollars in coal byproduct that would not have been covered in the CEMEX Agreement; however, it is unclear whether these invoices were included in the calculation. *See, e.g.*, Claim Attachment, pp. 39–41, 87 and 91.

42. CEMEX was notified over a year ago regarding the inflated calculation but has failed to amend and provide the correct information required by Bankruptcy Rule 3001, despite CEMEX having had almost a year to amend its Claim to provide supporting documentation and calculations.

43. Further, CEMEX included in its Claim attorneys' fees in the amount $15,127.50 and expenses in the amount of $46.40, which was also noted by the Reorganized Debtor last year. CEMEX did not include an itemized statement of these fees and expenses consistent with Bankruptcy Rule 3001(c)(2)(A). Without such information, the Reorganized Debtor cannot determine why or how the fees and expenses were incurred.

44. Pursuant to Bankruptcy Rule 3001(c)(2)(D), CEMEX should be precluded from presenting the omitted information or documentation because such omissions (1) have harmed the Reorganized Debtor because it has incurred its own fees defending against the Claim to the

23223211.v4

detriment of other creditors, and (2) cannot be substantially justified because CEMEX has had almost a year since the Reorganized Debtor first raised issues with the Claim to file an amended claim and it has not.

45.   Therefore, the Claim should be disallowed under section 502(b)(1) as not being filed according to Bankruptcy Rule 3001.

**III.   If CEMEX's Claim is Not Fully Disallowed Under Section 502 of the Bankruptcy Code, CEMEX's Claim Should Be Reduced to Reflect Proper Calculation of Cover Damages and Allow Offset of the Reorganized Debtor's Attorneys' Fees.**

46.   Alternatively, if the Court finds that CEMEX's Claim should not be entirely disallowed under section 502 of the Bankruptcy Code, CEMEX's Claim—at a minimum—should be reduced to reflect the proper calculation of damages under section 47–2–712 of the Tennessee Code.  Further, the Reorganized Debtor should be provided fees for having to file this Objection.

47.   Section 47–2–711 of the Tennessee Code, which mirrors the UCC, provides that "[w]here the seller fails to make delivery . . . the buyer may cancel and . . . (a) cover and have damages under the next section as to all the goods affected . . . ." T.C.A. § 47–2–711(1).

48.   Section 47–2–712 of the Tennessee Code, which also mirrors the UCC, provides that "the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." T.C.A. § 47–2–712(1).  Further, "[t]he buyer may recover from the seller as damages **the difference between the cost of cover and the contract price** together with any incidental or consequential damages as hereinafter defined (§ 47–2–715), but less expenses saved in consequence of the seller's breach." T.C.A. § 47–2–712(2) (emphasis added).

49.   The Reorganized Debtor does not dispute that CEMEX purchased replacement coal when Firestar failed to supply the amount required under the Firestar Agreement.  However,

12

CEMEX's claim calculation is the **total** amount of the replacement coal, not just the difference between the replacement coal and the contract price as required by section 47–2–712 of the Tennessee Code, as well as attorneys' fees and costs that are not itemized or explained in any acceptable detail, as explained above.

50. CEMEX purchased replacement coal for, on average, $103 per ton. *See* Claim Attachment, pp. 37, 44, 59, 67, 86 and 89. According to CEMEX's Claim, it purchased approximately 47,099 tons of coal for $4,851,221.53. [Claim Attachment, p. 1.] Under the CEMEX Agreement, Coal Network was to supply coal at $75 per ton. *See* CEMEX Agreement, § 2.1. The difference between the contract price and the average purchase price was $28 (the "Cover Cost"). Applying the Cover Cost to the tons purchased as estimated in the Claim, the amount to make CEMEX whole was $1,318,788.67. CEMEX inflated its cover damages by over three million dollars, despite the fact that the CEMEX Agreement had no incidental or liquidated damages provision.

51. Additionally, CEMEX's Claim admits that it offset its damages by invoices owed to Coal Network in the amount of $984,870.25.

52. Therefore, CEMEX's Claim should be reduced to the Cover Cost of the tons of coal purchased, less the amount retained for offset, which is $333,908.42.

53. As explained above, CEMEX's Claim also included amounts for attorneys' fees and costs without providing any description of the services and costs. Without more specific information, those amounts cannot be included as "commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." T.C.A. § 47–2–715(1).

13

23223211.v4

54. Further, because CEMEX inflated its claim by over three million dollars and CEMEX was notified of the error, the Reorganized Debtor should be entitled, under the CEMEX Agreement, to offset its attorneys' fees in having to bring this Objection.

55. Therefore, to the extent that the Claim is not denied in full, the Claim should be reduced to $333,908.42, less the Reorganized Debtor's attorneys' fees to be supplemented by affidavit of the undersigned.

## NOTICE

56. **Your claim may be reduced, modified or eliminated. You should read these papers carefully and discuss them with your attorney if you have one.**

57. Notice of this Objection shall be provided to the U.S. Trustee, the subchapter V trustee and CEMEX, or their attorneys.

58. A hearing on this Motion is set for **December 13, 2023 at 10:30 a.m.** in the U.S. Bankruptcy Court, Carl Perkins Federal Building, U.S. District Courtroom, 1405 Greenup Avenue, Suite 204, Ashland, Kentucky.

59. The deadline to file any response to the Objection is December 10, 2023 (the "Response Deadline"). Any response to the Objection must be filed electronically at www.kyeb.uscourts.gov, or delivered, in writing, to the U.S. Bankruptcy Court, Eastern District of Kentucky, 100 East Vine Street, Suite 200, Lexington, Kentucky 40507, with a copy to the Reorganized Debtor's counsel: April A. Wimberg, Dentons Bingham Greenebaum LLP, 3500 PNC Tower, 101 South Fifth Street, Louisville, Kentucky 40202, or april.wimberg@dentons.com, on or before the Response Deadline. If you mail your response to the Bankruptcy Court, you must mail it early enough so the Court will receive it on or before the Response Deadline.

60. The Reorganized Debtor submits that no other notice need be given and that this Objection complies with all notice requirements under the Bankruptcy Rules. This Objection will be served by the Reorganized Debtor's counsel according to the certificate of service included herewith.

WHEREFORE, the Reorganized Debtor respectfully requests that the Court enter an order (i) disallowing the Claim, or in the alternative, reducing the Claim, and (ii) granting such further relief as the Court deems just and proper.

Dated: November 10, 2023						Respectfully submitted,

							*/s/ April A. Wimberg*
							April A. Wimberg
							Gina M. Young
							DENTONS BINGHAM GREENEBAUM LLP
							3500 PNC Tower
							101 South Fifth Street
							Louisville, Kentucky 40202
							Phone: (502) 587-3606
							Fax:    (502) 540-2215
							Email: april.wimberg@dentons.com
							           gina.young@dentons.com

							*Counsel to the Reorganized Debtor*

23223211.v4

**CERTIFICATE OF SERVICE**

      I certify that on November 10, 2023, the foregoing was served electronically through the Court's ECF system to all person receiving electronic notifications in the Chapter 11 Case. Also, on November 10, 2023, a copy of the foregoing was sent via first class United States Mail to each of the parties at the addresses set forth below:

CEMEX Construction Materials Atlantic, LLC
Attn: Salvador Pamanes
10100 Katy Freeway, Suite 300
Houston, TX 77043

David P. Billings
Fabian Vancott
95 South State Street, Suite 2300
Salt Lake City, UT 84111

*Counsel for CEMEX Construction*
*Materials Atlantic, LLC*

                                              */s/ April A. Wimberg*
                                              April A. Wimberg

23223211.v4