# EXHIBIT B

# COAL SUPPLY AGREEMENT
*Firestar Energy, LLC – Coal Network, LLC – 2020 - 2022*

**THIS COAL SUPPLY AGREEMENT** ("Agreement") is entered into this ___ day of June 2020, by and between Firestar Energy, LLC, a Kentucky limited liability company ("Supplier") in London, Kentucky, and Coal Network, LLC., an Ohio limited liability company, with its main office address at 7697 Innovation Way, Suite 100, Mason, OH, 45040 ("Buyer").

The main contact for Buyer is as follows:

| | |
|---|---|
| Coal Network, LLC.<br>7697 Innovation Way<br>Suite 100<br>Mason, Ohio 45040 | Contact: Gerald Quitter<br>Phone: 513-701-0378<br>Fax: 513-398-5419<br>Email: gquitter@coalnetwork.com |

The main contact for Supplier is as follows:

| | |
|---|---|
| Firestar Energy, LLC<br>P.O. Box 1482<br>London, KY 40743 | Contact: Dwayne Jones<br>Phone: 606-682-0025<br>Fax: 606-877-0076<br>Email: dnrjones@aol.com |

The address for Buyer's customer is:

Knoxville Cement Plant
6212 Cement Plant Road
Knoxville, TN 37924

## WITNESSETH

WHEREAS, in its operation, BUYER's customer requires a dependable and high quality coal source and a supplier with the experience and capability necessary to supply such material;

WHEREAS, Supplier is a competent supplier of coal, owning or controlling or having exclusive right to offer Coal (as defined herein) for sale sufficient to meet the quantities stated herein;

WHEREAS, BUYER wishes to receive Coal from Supplier and Supplier wishes to provide Coal to BUYER; and

WHEREAS, BUYER and Supplier shall be collectively referred to as the "Parties" or singularly as a "Party".

NOW THEREFORE, in consideration of the mutual covenants contained herein, and such other good and valuable consideration the receipt thereof being hereby acknowledged, Supplier agrees to provide Coal to BUYER on the terms and conditions set forth herein.

## SECTION 1: COAL AND SOURCE

**1.1** Supplier shall sell to BUYER, Coal, meeting the specifications set forth on **Appendix A** attached hereto and incorporated herein by reference. Coal meeting such specifications is referred to in this Agreement as "Coal".

**1.2** The Coal shall be supplied from the designated sources set forth in Section 5.2.1 of this Agreement and incorporated herein by reference (the "Production Location"). Supplier represents and warrants that the Production Location contains economically recoverable Coal of a quality and in quantities that are sufficient to satisfy all the requirements of this Agreement, including but not limited to the Coal Quality specifications contained in Appendix A of this Agreement. Prior to the commencement of the Term, Supplier undertakes to allocate (for the purposes of this Agreement) sufficient reserves of Coal meeting the quantity and quality specifications set forth in this Agreement and lying on or in the Production Location, to fulfill all of the requirements under this Agreement. Supplier shall not supply Coal to BUYER from any other source, except as approved in advance in writing by BUYER. If Supplier is unwilling or unable to supply the Estimated Quantity (as defined in Section 3.1 of this Agreement), then Supplier agrees that (a) BUYER shall have the right to obtain, without breaching this Agreement and without being subject to any type of penalty whatsoever by doing so, coal from other sources different from Supplier (the "Replacement Coal") and Supplier shall no later than 5 calendar days after obtaining the Replacement Coal reimburse BUYER for any and all costs, including adjusted Price (as defined in Section 2.2 of this Agreement), incurred by BUYER in obtaining the Replacement Coal. If for any reason Supplier does not reimburse BUYER for the costs associated from BUYER acquiring the Replacement Coal as provided in this Agreement and any invoice issued by Supplier to BUYER is outstanding as of the date thereof, Supplier agrees that BUYER may offset any such amount owed by Supplier to BUYER in relation to reimbursement costs in connection to acquiring the Replacement Coal against any amount due by BUYER to Supplier under any issued and outstanding invoice.

## SECTION 2: PRICE AND PRICE ADJUSTMENT

**2.1** Coal is transported and delivered to BUYER Plant on truck (each day is a "Shipment") at a price of $58.50 per short ton ("Price").

**2.2** If BUYER accepts coal that is outside of the rejection limit specification ranges described in **Appendix A**, then the Price is subject to adjustments based on the analysis determined in Section 8.3 of this Agreement for both moisture content and non-moisture specifications as described below. For clarity, the price may be adjusted for both the moisture content and the non-moisture specification simultaneously.

   **2.2.1  Moisture Adjustment.** The Price as adjusted for actual moisture content on an "As Received" basis ("Actual Moisture Content") shall be as set forth in the Moisture Adjustment Table below ("Table 2.2.1"). The Actual Moisture Content will be determined as per the analysis in Section 8.3 of this Agreement, and provided for in the certificate of analysis issued by the independent certified laboratory ("ICL") which will be provided to BUYER on a weekly basis and will be a composite average of all Coal shipped during said month.

Table 2.2.1

| Moisture Adjustment Table ||  |
|---|---|---|
| Moisture Content (%) || Per Ton Price Adjustment |
| Above | 10.00% | $0.40/Ton per 1.00% Moisture Content above 10.00%, prorata. |

2.2.2 **Non-moisture Adjustment.** There will also be a Price adjustment for coal which is accepted but fails to meet specifications other than moisture, specifically Ash, Sulfur, Mercury and Chlorine content, that are over the rejection limits listed in Appendix A. The adjustment for exceedance of non-moisture specifications shall be per the Non-moisture Adjustment Table ("Table 2.2.2"). The Actual Content of materials will be determined as per the analysis in Section 8.3 of this Agreement, and provided for in the certificate of analysis issued by the Independent Certified Laboratory ("ICL") which will be provided to BUYER on a monthly basis and will be a sample analyzed by ICL from the BUYER's Split Samples of all truckload Samples taken during the Delivery Month.

Table 2.2.2

| Non-moisture Adjustment Table |||
|---|---|---|
| Specification/Maximum Limit % || Price Adjustment |
| Specification | Limit | Per Ton Adjustment |
| BTU | 12,000 | $0.50/Ton per 100 BTU above or below 12,000 BTU prorata |
| ASH - | 15.00% | $0.40/Ton per 1.00% Ash Content above 15.0%, prorata |
| SULFUR - | 2.00% | $0.40/Ton per 0.10% Sulfur Content above 3.50%, prorata. |
| MERCURY - | 60 PPB | $0.20/Ton per 50 PPB Mercury above 60 PPB, prorata. |
| CHLORINE - | 1200 PPM | $0.20/Ton per 100 PPM Chlorine above 1200 PPM, prorata. |

## SECTION 3: QUANTITY, EXCLUSIVITY AND ALTERNATIVES

3.1 **Estimated Quantity.** Supplier shall supply and BUYER shall purchase approximately 170,000 short tons of Coal shipped ratably during the Term of this Agreement.

3.2 **Not a Requirements Arrangement.** BUYER may, at any time, purchase and use alternative fuels from third parties (e.g., petroleum coke, reclaimed solid wastes of natural, synthetic or processed origin, waste liquids, tires and/or other appropriate fuels, etc.).

## SECTION 4: WARRANTY AND NON-CONFORMING COAL

4.1 **Title Warranty.** Supplier warrants that the Coal will be delivered free and clear of all claims, encumbrances and liens.

4.2 **Quality Warranty.** Coal sold hereunder shall be: (i) substantially free from all impurities including, but not limited to, bone, slate, earth, rock, pyrite, wood, or blasting wire, (ii) in substantial conformance with the Typical "As Received" Quality Specifications as set forth in Appendix A of this Agreement, and (iii) in conformance with the guaranteed "As Received" Rejection Limit Quality Specifications as set forth in Appendix A of this Agreement on a weekly basis as noted in Section 8.2. BUYER shall have the rights referenced in Section 4.4, as well as other applicable rights under this Agreement, in the event the Coal fails to conform to the Rejection Limit Quality Specifications in Appendix A.

4.3 **Non-conforming.** Delivered Coal not meeting the Reject Limits in Appendix A or the warranty

in Section 4.2 is deemed to be Non-conforming coal. BUYER reserves the right to reject Non-conforming coal in accordance with the terms of this Agreement.

**4.4     Acceptance or Rejection.** The remedies available to BUYER, during the term of this Agreement, in the event that any daily Shipment of coal made hereunder fails to conform to the Rejection Limit Quality Specifications set forth in Exhibit A hereto shall be as follows:

**4.4.1** Reject any or all such daily Shipment, at Supplier's sole expense, in which event it shall be Supplier's obligation to makeup such quantity of rejected coal with Coal that complies with the quality specifications agreed under this Agreement as soon as practicable, or

**4.4.2** Accept any or all such Shipments at a mutually agreeable reduced Base Price.

Additionally, if Supplier delivers, during the contract year of this Agreement, 15 Shipments of Coal that fail to conform to the Rejection Limit Quality Specifications set forth in Appendix A hereto, then BUYER may elect to terminate this Agreement if Supplier has been unable to cure to BUYER's satisfaction within 30 days from notification by providing written notice to Supplier, in which event neither party shall have any further obligations under this Agreement, except to pay any amounts due or outstanding on the date that BUYER's notification was received by Supplier and that Supplier would still need to comply with any reimbursement obligations under Section 1.2 of this Agreement (if any exist).

## SECTION 5: DELIVERIES, PRODUCTION AND DELIVERY LOCATIONS

**5.1     Shipment deliveries.** Supplier shall be responsible for collecting, preparing, washing, screening, handling, loading and delivering the Coal to the BUYER plant. Supplier will comply with all reasonable instructions of the BUYER plant in connection with the delivery of the Coal from Production Location to the BUYER plant. A copy of the bill of lading ("BOL"), for each Shipment part of the Quantity defined in Section 3.1 of this Agreement, shall be provided to BUYER.

**5.2     Production and Delivery Location**

    **5.2.1**   Production Location:
    Mine Operator: H&D Mining
    MSHA ID: 15198058
    Location: Leslie County, KY
    Type: Bituminous
    Seam:

    Alternate Mine Operator: T&T Coal
    MSHA ID: 1519800
    Location: Owsley County
    Type: Bituminous
    Seam:

    **5.2.2**   Delivery Location:
    CEMEX Plant (Knoxville Plant)
    6212 Cement Plant Road
    Knoxville, TN 37924

    **5.2.3   Delivery and Unloading hours at the Delivery Location are as follows:** Deliveries of every individual Shipment to the Delivery Location shall be coordinated with the

Plant. Deliveries shall be between the hours of 7AM and 7PM unless otherwise scheduled with the Delivery Location with advance notice.

**5.3** **Risk of Loss and Title Transfer.** Risk of loss and Title of Coal will pass to BUYER when delivered to the Delivery Location.

### SECTION 6: TERM AND TRIAL PERIOD

**6.1** **Term.** This Agreement shall be in effect from the 1st day of June 2020 unless both parties are in receipt of a fully executed Agreement, in which the Effective Date shall be determined by the last Party to sign, and shall continue through May 31, 2022 until all obligations hereunder are fully fulfilled by each Party or until any other time that this Agreement is terminated pursuant to Article 14 hereunder. No suspension of an obligation under this Agreement by reason of force majeure shall extend the term except upon mutual Agreement in writing by both Parties.

**6.2** **Trial Period.** The Parties intend for the first month to be a trial period, during such period BUYER may terminate the Agreement without liability (other than payment of conforming Coal delivered through termination) upon written notice to Supplier if delivered coal does not meet the quality specifications described herein.

### SECTION 7: INVOICES, BILLING AND PAYMENT

**7.1** **Invoice Procedures and Payment Terms.** Supplier will be paid on a weekly basis according to the quantity of short tons delivered at the Delivery Location. Supplier payment terms are Friday following week of delivery providing a proper invoice and shipment detail and quality are submitted by Wednesday afternoon.

**7.2** **Taxes.** All taxes, fees, duties, and other similar charges (however denominated) imposed on, or arising out of, the sale of Coal to BUYER or on the Coal subsequent to the passage of title to BUYER shall be for the account of and payable by BUYER, and all such items imposed prior to the passage of title to BUYER shall be for the account of and payable by Supplier, according to the applicable law. Any income taxes arising out of or by virtue of this Agreement or its performance shall be for the sole account of the Party on which legally imposed.

**7.3** **Payment Dispute.** BUYER shall have the right to withhold from payment any invoice or portion thereof which BUYER, in its good faith, disputes. In the event BUYER elects to exercise its rights under this section, BUYER shall notify Supplier as soon as possible of such election but not later than the due date of the payment, notify Supplier of its intent to withhold payment and detail the amount and basis of any dispute. Thereafter, the Parties shall engage in good faith negotiations in an effort to resolve the dispute. In the event the Parties are unable to reach an agreement within sixty (60) days, the dispute shall be resolved in accordance with this Agreement.

### SECTION 8: WEIGHTS, SAMPLING, AND ANALYSIS

**8.1** **Weights.** For purposes of calculating the quantity of Coal delivered to the Delivery Location, the Coal shall be weighed on certified commercial scales at the Delivery Location unless another method is mutually agreed upon by the Parties. Supplier shall have the right at its own expense, and upon reasonable notice, to have scales checked for accuracy at any reasonable time or frequency. If the scales are inaccurate, over or under a tolerance range of 0.5%, either party shall pay to the other any amounts owed due to such inaccuracy for a period not to exceed thirty (30) days before the time any inaccuracy of scales is

determined. Such weights shall be final and binding and shall govern for payment.

**8.2    Sampling.** Unless collection is performed by an Independent Certified Lab ("ICL"), Supplier shall collect representative Coal samples on a weekly basis from the Coal shipped to the Delivery Location and provide such samples to the ICL.

**8.3    Analysis.** The ICL shall comply with all applicable standards of the American Society for Testing and Materials ("ASTM"). Each composite monthly sample will be subdivided into three (3) split samples, each of which will contain at least one thousand (1000) grams of coal. For ease of reference, this Agreement will refer to the three split samples as "Supplier's Split Sample," "BUYER's Split Sample", and the "Referee Split Sample." Supplier's Split Sample will be promptly analyzed in the manner set forth below. Upon request, within 24 hours after sampling, Supplier shall send BUYER's Split Sample to BUYER's designated laboratory for analysis. Supplier will cause the Referee Split Sample to be preserved in an airtight container for forty-five (45) days following the delivery to BUYER of the Shipment of coal from which the sample was taken for use, if necessary, pursuant to the further provisions of this Section 8. If the sampling system utilized at the Production Location becomes inoperative for any reason, BUYER and Supplier will agree on an alternate method of sampling. Supplier shall pay for the cost of sampling. Supplier or Supplier's contractor shall analyze Supplier's Split Sample pursuant to all applicable standards of ASTM for the quality parameters set forth in this Agreement and shall send a report of its analysis of coal to the following electronic mail addresses:

gquitter@coalnetwork.com
sgardner@coalnetwork.com
smiller@coalnetwork.com

or to such other person and/or location as BUYER shall notify Supplier in writing (or Supplier shall deliver such report by any other method agreed upon by Supplier and BUYER). The results of the analysis of Supplier's Split Sample shall determine quality of coal delivered hereunder for acceptance or rejection purposes subject to additional determination in the following paragraph. Supplier shall pay the cost for the analysis of Supplier's Split Sample and BUYER shall pay the cost of analysis of BUYER's Split Sample.

Should Supplier's analysis of Supplier's Split Sample differ, as to one or more quality parameters, from BUYER's Split Sample by more than the ASTM standard for reproducibility, the quality parameters in question shall be determined by an analysis of the Referee's Split Sample performed by an independent laboratory chosen jointly by BUYER and Supplier. Such independent laboratory analysis of the Referee's Split Sample shall be binding on the parties as to the quality parameter(s) in question. The cost of the independent laboratory analysis will be paid by BUYER.

If neither BUYER nor Supplier requests an analysis of the Referee Split Sample within a forty-five (45) day period following the date that a sample was taken, Supplier shall have the right to dispose of such Referee Split Sample and neither party shall have the right to request an analysis of the Referee Split Sample.

**8.4**    Absent a clear and manifest error, the results of such independent analysis shall be accepted by the Parties as the quality of the coal, and shall be binding as representing the characteristics of the coal for purposes of determining the Base Price adjustment contemplated in Section 2.2 of this Agreement.

## SECTION 9: FORCE MAJEURE

**9.1    Events of Force Majeure.** If because of Force Majeure or Environmental Force Majeure either

Party is unable, in whole or in part, to carry out any of its obligations under this Agreement, and if such Party promptly gives notice to the other Party of such Force Majeure or Environmental Force Majeure, then the obligations of the Party giving such notice are suspended to the extent and for the period made reasonably necessary by such Force Majeure or Environmental Force Majeure; provided, however, that the notifying Party proceeds with all reasonable dispatch to remedy, if possible, the cause of such Force Majeure or Environmental Force Majeure.

As used herein, "Force Majeure" shall mean any event or cause beyond the reasonable control of a Party that cannot be prevented or eliminated by the exercise of due diligence including but not limited to acts of God, pandemic, strike, lockout or other labor dispute, sabotage, fire, storm, flood, war, riot or insurrection, explosion, accident, embargo, blockade, regulation, rule, law, order, act or restraint of any civil or military authority, inability to secure supplies, governmental authorization or permit, unscheduled or forced outages at the BUYER Plant, breakdown of or damage to machinery, plants or equipment, not the fault of the Party claiming under the Section, interruption or shortage of transportation arrangements or equipment or any other cause of the kind herein enumerated.

As used herein, "Environmental Force Majeure" shall mean any permit, law, regulation, policy, or restriction issued or enacted including those currently enacted but not yet enforced or operative against BUYER, by any regulatory body having jurisdiction or any court decision having a similar effect, relating to air pollution or other environmental matters which make it impossible or commercially impractical for BUYER to utilize Coal delivered under this Agreement or like kind and quality material. In determining whether BUYER's continued performance is "commercially impractical", the phrase shall mean that if production following Environmental Force Majeure would result in requiring BUYER to obtain a new permit or result in a total cost to BUYER in using Supplier's Coal (including, but not limited to, the cost of permitting, monitoring, equipment, software, installation or reporting) in excess of the total cost of using other competitive permitted alternative fuels or traditional fuels. The cost of using such other fuels over the remainder of the term of this Agreement, including anticipated increases in the price of such fuels and of any required permits, reporting, modifications, adjustments, or additions to BUYER's Plant shall be considered for the purpose of this Section.

**9.2   Suspension of Performance for Force Majeure or Environmental Force Majeure.** If a condition of Force Majeure or Environmental Force Majeure occurs, the mutual obligations of both Parties arising out of the event of Force Majeure or Environmental Force Majeure shall be suspended to the extent caused by the event. Should the condition of Force Majeure or Environmental Force Majeure continue for a period of sixty (60) days following notice by the Party of the event, then either Party may terminate this Agreement under terms and conditions contained in Section 9.3 of this Agreement.

**9.3   Termination under Force Majeure.** If as a result of an Environmental Force Majeure or the adoption of such laws, regulations, policies, or restrictions, or change in the interpretation or enforcement thereof, BUYER decides that it will be impossible or commercially impractical for BUYER to utilize such Coal, BUYER shall so notify Supplier, and thereupon BUYER and Supplier shall promptly consider whether corrective actions can be taken in the preparation of the Coal and/or in the handling and utilization of the Coal at the BUYER Plant; and if in BUYER's judgment such actions will not, without unreasonable expense to BUYER, make it possible and commercially practical for BUYER to so utilize Coal which thereafter would be delivered hereunder without violating any applicable law, regulation, policy or order, BUYER shall have the right upon twenty (20) days' notice to Supplier, to terminate this Agreement.

## SECTION 10: AUDIT AND INSPECTION

BUYER (or its authorized representative) shall have the right to inspect, review, and audit Supplier's

records with respect to methods by which Coal is handled, sampled, analyzed and loaded hereunder at any time during regular business hours, and upon reasonable notice to Supplier. BUYER shall maintain and cause its representatives to maintain all data and information discovered pursuant to this Section in confidence except to the extent that disclosure thereof may be required by law. BUYER shall have the right at all reasonable times to audit and inspect such records for a period of two (2) years following termination of this Agreement.

## SECTION 11: NOTICES

**11.1   Form and Place of Notice.** Any official notice, request for approval or other document required to given under this Agreement shall be in writing, unless otherwise provided herein, and shall be deemed to have been sufficiently given if delivered in person, transmitted by telegraph, telex, or telecopy, or dispatched in the United States mail, postage prepaid, for mailing for first class, certified, or registered mail, return receipt requested and addressed as follows:

> If to Buyer:   Attn:Gerald Quitter
> Coal Network,LLC
> 7697 Innovation Way, Suite 100
> Mason, OH, 45040
>
> If to Supplier:   Attn: Dwayne Jones
> P.O. Box 1482
> London, KY  40743

**11.2   Change of Person or Address:** Either Party may change the person or address specified above upon giving notice to the other Party of such change.

## SECTION 12:  RIGHT TO RESALE

BUYER has the right to resell any Coal quantities to other BUYER plants or BUYER entities.

## SECTION 13:  INDEMNITY

**13.1** SUPPLIER AGREES TO INDEMNIFY, DEFEND AND HOLD THE OTHER PARTY HARMLESS FROM ANY AND ALL LOSSES, LIABILITIES, DAMAGES, CLAIMS (INCLUDING, WITHOUT LIMITATION, CLAIMS FOR PERSONAL INJURY, BODILY INJURY, ILLNESS, DEATH OR PROPERTY DAMAGE), COSTS, EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES), PENALTIES, FINES AND JUDGMENTS OF ANY NATURE WHATSOEVER (COLLECTIVELY "LOSSES"), CAUSED BY OR ARISING OUT OF ANY ACTION, OMISSION, NEGLIGENCE, WILLFUL MISCONDUCT, STRICT LIABILITY, ENVIRONMENTAL LIABILITY OR OTHER RESPONSIBILITY OR FAULT OF THE INDEMNIFYING PARTY, OR ANY OTHER BREACH OF THIS AGREEMENT BY THE INDEMNIFYING PARTY.

**13.2**   Supplier warrants, represents and covenants that the Coal does not infringe directly or indirectly any patent, copyright, trade secret, trademark, or other intellectual property right, and Supplier agrees to release, defend, indemnify and hold BUYER harmless from and against any and all costs (including reasonable attorney fees and court costs), expenses, fines, losses, damages, and liabilities arising out of any alleged or actual patent, copyright, trade secret, trademark, or other intellectual property right or infringement. If the Coal or any part thereof is held to constitute an infringement, and the use of the Coal or any part thereof is enjoined, Supplier will, at its own expense, either procure for BUYER the right to

continue utilizing the Coal, replace the infringing Coal with a non-infringing product or process acceptable to BUYER, modify the Coal so that it becomes non-infringing, or in the event the foregoing options are not possible, compensate BUYER for all BUYER's expenses resulting from the infringement. The obligations of Supplier under this Paragraph shall be binding on the assigns, executors, administrators and other legal representatives to the extent that any of them can fulfill those obligations left unfulfilled by Supplier.

## SECTION 14: TERMINATION FOR DEFAULT

**14.0** BUYER shall have the right to terminate all or any portion of this Agreement upon the happening of any of the following events of default by Supplier:

- The insolvency of Supplier.
- If Supplier is adjudged bankrupt.
- If a general assignment of Supplier's assets is made for the benefit of creditors.
- If a receiver is appointed for Supplier or any of Supplier's property.
- If Supplier is in violation of any governmental statute, rule or regulation with which Supplier does not comply promptly following notice.
- If Supplier is in default of any material provision of the Agreement.

Prior to exercising the right of termination, BUYER shall give to Supplier sixty (60) days' notice of its intention to terminate specifying the nature of the default. Upon expiration of sixty (60) days, unless Supplier shall have cured such condition, BUYER shall have the right at its election to terminate this Agreement forthwith. This right shall be in addition to the rights provided to either Party in other portions of this Agreement or as may be provided at law or equity.

**14.1** BUYER may terminate this Agreement for operational causes by giving written notice to Supplier of such termination at least sixty (60) days prior to the date that such termination is to take effect. "Operational causes" for termination under this provision are any of the following:

- cessation of clinker production at the BUYER Plant for a period exceeding sixty (60) consecutive days;
- Labor interruptions longer than thirty (30) days;
- the Coal does not perform to the satisfaction of BUYER
- Use, handling, storage, transportation or receipt of the Coal (alone or in conjunction with other fuels or materials, or with clinker production or cement production process changes) could result in compliance, permitting, reporting or operational issues, difficulties or costs for BUYER, including but not limited to, potential impacts to BUYER's kiln(s) classification under the United States Environmental Protection Agency's (or similar state agency's) air emissions regulations such as the regulations for Commercial/Industrial Solid Waste Incinerators (CISWI) or potential impacts to air emissions subject to the National Emission Standards for Hazardous Air Pollutants. This termination provision applies regardless of whether BUYER has made equipment, materials, fuels or other operational changes at the BUYER Plant that caused or contributed to the difficulties, costs or impacts described above.

**14.2** Supplier may terminate this agreement upon any of the following events:

- The insolvency of BUYER.
- If BUYER is adjudged bankrupt.
- If a general assignment of BUYER's assets is made for the benefit of creditors.
- If a receiver is appointed for BUYER or BUYER's property.

- If BUYER fails to order Coal for 60 consecutive days (however, if BUYER orders from any location in the 60 days, then the condition is not met).
- BUYER is delinquent for more than 60 calendar days in paying amounts due and owing pursuant to the terms and conditions in section 7.1; and
- BUYER is in default of any material provision of this Agreement and has failed to cure such default hereunder.

Prior to exercising the right of termination, Supplier shall give to BUYER sixty (60) days' notice of its intention to terminate specifying the nature of the default. Upon expiration of sixty (60) days, unless BUYER shall have cured such condition, Supplier shall have the right at its election to terminate this Agreement forthwith. This right shall be in addition to the rights provided to either Party in other portions of this Agreement or as may be provided at law or equity.

## SECTION 15: REPRESENTATIONS

**15.1** **Representations and Warranties of BUYER.** BUYER hereby represents and warrants to Supplier, that on the date hereof:

    **15.1.1** The execution and delivery of this Agreement by BUYER has been duly authorized by all necessary action and this Agreement constitutes a legal, valid and binding obligation of BUYER enforceable against BUYER in accordance with its terms, subject to applicable laws.

**15.2** **Representations and Warranties of Supplier.** Supplier hereby represents and warrants to BUYER, with the intention to induce BUYER to enter into this Agreement, that on the date hereof:

    **15.2.1** Supplier is in the business of marketing Coal and is organized as a limited liability company duly organized, validly existing and in good standing under of the laws of the State of Ohio and is fully qualified to do business in such other jurisdictions in which its business and activities require qualification

    **15.2.2** The execution and delivery of this Agreement has been duly authorized by all necessary corporate action and this Agreement constitutes a legal, valid and binding obligation of Supplier, enforceable against Supplier in accordance with its terms.

    **15.2.3** Supplier's producer has received and will maintain the approvals, permits and licenses necessary to perform its obligations under this Agreement from all public regulatory bodies having jurisdiction. The execution and delivery of this Agreement and the requirements hereunder do not require the consent of any third Party nor will they result in a breach or default of any other Agreement to which Supplier is a Party or by which Supplier is bound.

    **15.2.4** The Coal to be supplied under this Agreement shall be delivered to BUYER free and clear from any covenants, restrictions, liens or other encumbrances of any nature whatsoever upon delivery to BUYER.

    **15.2.5** Supplier has the financial means to fulfill its obligations hereunder.

## SECTION 16: CONSTRUCTION OF AGREEMENT

**16.1** **Choice of Law.** This Agreement shall be construed and interpreted in accordance with the laws of the State of Tennessee. Venue selection: Any suit, action or proceeding relating to or arising from the Agreement must be brought exclusively in the state or federal court of Knox County, Tennessee, BUYER

and Supplier waive to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of venue of such suit, proceeding or action, in such court or that such suit, proceeding or action which is brought in such court have been brought in an inconvenient forum.

**16.2   Headings.** The paragraph headings appearing in this Agreement are for convenience only and shall not affect the meaning or interpretation of this Agreement.

**16.3   Waiver.** The waiver by any either Party of any default by the other Party hereunder, or the failure of either Party to, at any time, insist upon strict performance with any of the terms and conditions of this Agreement, shall not be deemed a waiver by such Party of any default by the other which thereafter may occur or a waiver by such Party of its right to insist upon strict performance by the other Party thereafter.

**16.4   Remedies Cumulative.** Remedies provided under this Agreement shall be cumulative and in addition to other remedies provided by law.

**16.5   Compliance with Laws.** Supplier and BUYER shall be familiar with, and perform this Agreement in full compliance with, all applicable local, state, or federal laws, regulations, rules, guidelines, orders or judgments in any way relating to or affecting Supplier or BUYER, their businesses, or the production, acquisition, sale, handling, transportation, use, recycling or other disposition of the Coal or otherwise relating to the transactions contemplated under this Agreement, whether currently existing or hereafter enacted, including, without limitation, those relating to employees, health and the environment (collectively, "Applicable Laws"), and all regulatory, permitting, licensing, filing and other requirements (collectively, "Governmental Requirements") necessary under any Applicable Laws, relating to Supplier or BUYER and/or the performance of this Agreement. Supplier shall comply and require its employees or subcontractors and agents to comply with the general standards, rules and safety requirements of the applicable BUYER Plant including all applicable laws, codes and ordinances, and all regulations issued thereunder, including applicable safety rules and regulations promulgated by the Mine Safety and Health Administration, and the Occupational Safety and Health Administration, as set forth on **Appendix B** attached hereto and incorporated herein by reference.

**16.6   Severability.** If any provision of this Agreement is found contrary to law or unenforceable by any court of law, the remaining provisions shall be severable and enforceable in accordance with their terms, unless such unlawful or unenforceable provision is material to the transactions contemplated hereby, in which case the Parties shall negotiate in good faith a substitute provision.

**16.7   Binding Effect.** This Agreement shall bind and inure to the benefit of the Parties and their successors and assign.

**16.8   Assignment.** Supplier shall not assign this Agreement or any rights or obligations hereunder without the prior written consent of BUYER, which consent shall not be unreasonably withheld. BUYER shall not assign this Agreement or any rights or obligations hereunder without the prior written consent of Supplier, which consent shall not be unreasonably withheld.

**16.9   Relationship of parties.** Supplier is an independent contractor of BUYER. Supplier has no employment relationship with BUYER and no such relationship is intended by execution of this Agreement. Nothing in this Agreement shall be construed to create a partnership, joint venture, agency, consignment, or other association for any purpose. Neither party shall authority to act for, represent or bind the other in any way or to sign the name of the other party.

**16.10   Confidentiality.** Each party hereto agrees to treat as strictly confidential and not to use or disclose to any third party, any confidential information concerning the other party's business, operations,

technologies, formulas, procedures, processes, methods, trade secrets, ideas, improvements, plans, programs, plants, equipment or customers, except as shall be necessary to perform this Agreement. Confidential information under this Section shall not include information (a) which was already known by the receiving party ("Recipient") prior to its disclosure by the other party hereto hereunder; (b) which now is or in the future becomes generally known within the industry through no wrongful act by Recipient; (c) which becomes known by Recipient on a non-confidential basis from some other source not under any obligation of confidentiality; or (d) which is required to be disclosed by law, a Court, tribunal, or governmental authority.

**16.11**  Time is of the essence.

**16.12  Entire Agreement.** Except as otherwise provided herein, this Agreement may not be amended, supplemented or otherwise modified except by written instrument signed by the Parties hereto.

**16.13  Anti-Corruption.** Supplier certifies that it is in compliance and shall at all times remain in compliance with all applicable anti-corruption and anti-bribery laws, including but not limited to the U. S. Foreign Corrupt Practices Act of 1977, as amended.

**16.14  Third Party Monitoring.** Supplier agrees, and Supplier shall cause its subcontractors or agents, to enter into an agreement with and work with a third party provider designated by BUYER for vendor management, including, but not limited to: screening vendors; collecting and monitoring certificates of insurance; and monitoring vendor compliance with certain federal and state laws.

## SECTION 17: INSURANCE REQUIREMENTS

**17.1**  During the term of this Agreement and so long as there remain any continuing obligations or duties (including, without limitation, any indemnification obligations), Supplier and/or its agents shall obtain and maintain at its expense insurance policies with insurance carriers rated A.M. Best A-VI or better and providing for minimum coverage limits as follows:

| | |
|---|---|
| Worker's Compensation | Statutory |
| Employer's Liability | $1,000,000 |
| Commercial General Liability including, without limitation, bodily injury, fire legal liability (of at least $100,000), products, completed operations | $1,000,000 per occurrence/$2,000,000 in the general aggregate/products-completed operations aggregate limit |
| Business Auto Coverage Form including, without limitation, bodily injury and property damage for owned, non-owned and hired vehicles | $1,000,000 per accident/$2,000,000 in the general aggregate |
| Umbrella Liability Insurance | $4,000,000 per occurrence and in the aggregate |

All such policies shall contain waivers of subrogation in favor of BUYER, its parent, subsidiaries, affiliated entities and it's insurers and shall name BUYER (except under the Worker's Compensation Policy) as an additional insured thereunder; and Supplier (and/or its agents) will deliver to BUYER one or more complete certificates of insurance signed by an authorized representative of each relevant insurance carrier certifying that such insurance has been issued to Supplier (and/or its agents) and is in full force and

that, if such insurance is cancelled or changed so as to affect the coverage, at least thirty (30) days' prior written notice of such cancellation or change will be sent to BUYER. It is understood and agreed that coverages required represent minimum requirements and are not to be construed to void or limit Supplier's indemnity or other liabilities under this Agreement or otherwise, nor to impose any manner of limitation of insurance coverages that Supplier (and/or its agents) may voluntarily elect to maintain for its own protection. All insurance required herein shall be primary coverage to any coverage which may be carried by BUYER.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first above written.

Supplier agrees to enter into an agreement with and work with a third party provider designated by BUYER for vendor management, including, but not limited to: screening vendors; collecting and monitoring certificates of insurance; and monitoring vendor compliance with certain federal and state laws.

**BUYER:**

**Coal Network, LLC**

Signature: _____

Print Name: George A. Witter

Title: President

Date: 6-4-20

**SUPPLIER:**

**Firestar Energy, LLC**

Signature: _____

Print Name: Tim Doty

Title: Member

Date: 6-2-20

## Appendix A
## "As Received" QUALITY SPECIFICATIONS

The coal delivered hereunder shall meet the following Typical "As Received" Quality Specifications and shall be deemed to be satisfactory Coal. Supplier also expressly warrants that the Coal shall be less than or equal to the maximum ("Max") and/or greater than or equal to the minimum ("Min")"As Received" Rejection Limit Quality Specifications, as applicable, as set forth in the Coal Specifications below. Coal falling outside of the "As Received" Reject Limits is considered to be non-conforming coal.

### Coal Specifications

Analytical Parameter as % by Weight or Size, as indicated:

|  | Typical | Reject Limit |
|---|---|---|
| Heat Content (Btu/lb) | 12,000 Typ | 11,700 Min |
| Sulfur (%) | 2.0 Max | 3.50 Max |
| Moisture (%) | 8.00 Max | 10.0 Max |
| Ash (%) | 14.00 Max | 15.0 Max |
| Volatile (%) | 33.00 Min | |
| Size (in) | 2 x 0 Max | |
| Fines (%) | 45 Max | |
| HGI | 46 Min | |
| Chlorine (PPM) | 1200 Max | 1200 Max |
| Mercury (PPB) | 60 Max | 60 Max |

### Appendix B

### Hazard Recognition and Standard Safety Rules for

### Outside Contractors, Vendors, Visitors and Licensees

BUYER'S customer, CEMEX Construction Materials Atlantic, LLC and its affiliates and subsidiaries (collectively, 'BUYERS'), in order to comply with the MSHA/OSHA Hazard Communication Standard and assure the safety of all, has compiled this listing of hazards, rules, regulations and applicable procedures to inform and protect all contractors, vendors, visitors, licensees, etc. while on CEMEX property.

The following information should be read and understood by all Non-CEMEX personnel before entering any of our facilities. If you do not understand, or have questions, you are responsible for asking a CEMEX representative for assistance. Violation of any of these Safety Rules may result in immediate and permanent dismissal from all CEMEX properties.

Outside contractors, vendors and visitors will abide by all CEMEX safety rules, OSHA regulations, MSHA regulations and safety training requirements as mandated by CEMEX policy, OSHA and MSHA (specifically those for Metal & Non metal mines located in 30 CFR, parts 48, 56, & 58).

Subject to other law, no weapons or firearms are permitted on CEMEX property.

Upon exiting a vehicle, Personal Protective Equipment (e.g. safety glasses, protective footwear, hi-visibility orange vests, hard hats, gloves, long pants, hearing protection where posted) is required in all areas of the facility beyond the identified PPE free areas.

Any equipment used on a CEMEX site shall meet the minimum standards of MSHA/OSHA with regard to noise and air emissions.

CEMEX's site is Tobacco-Free. No tobacco products (including e-cigarettes) are allowed on CEMEX property and may not be used in personal vehicles while on CEMEX's site.

Please observe all site control signs posted (e.g. speed limits, warning signs, and driving patterns) and (if applicable) pedestrians should stay within designated pedestrian walkways at all times.

Vehicles must be parked in designated areas and follow the site specific First Motion Forward policy. When entering CEMEX property, travel should be limited to the specific area where your services are required. Travel to other areas without authorization is not allowed. If you are not in a designated parking area, you must stay inside the vehicle unless otherwise instructed.

CEMEX is a drug and alcohol-free workplace. All contractors, vendors, visitors and their employees are expected to comply with CEMEX's drug and alcohol testing policy. Refusal or failure to participate, or a positive result from testing could result in immediate and permanent dismissal from all CEMEX properties.

Chemicals are in use on CEMEX properties. Before working with or around any of these potentially hazardous materials ask for information and/or Safety Data Sheets (SDS) about them and the dangers they pose.

No contractor, vendor or visitor may bring any chemicals onto CEMEX property without first presenting a current MSDS for each one to the Safety Officer of the plant and receiving authorization.

You may encounter various pieces of mobile equipment on the site (e.g. trucks, forklifts, front-end loaders, etc.). Be alert and stay clear of this equipment. They have the right-of-way at all times. Make sure the equipment operator positively acknowledges you are in the vicinity by using a "thumbs up" signal.

Do not under any circumstance walk behind, drive behind or park behind any other pieces of mobile equipment.

Contractors, vendors and visitors are to exercise extreme caution when crossing railroad tracks. Be sure trains are stationary, or moving away from crossings before proceeding.

Stay clear of moving and idle machinery (e.g. conveyors, fans, drives, etc.) unless the controls are locked out, tagged out, and tried out by you personally. Much of the machinery may be started from remote locations.

Do not move your truck long distances while having the bed raised. Delivery drivers may only move forward with the bed raised a short distance to allow the material to be fully unloaded.

A delivery driver should never be positioned under his/her truck or positioned between the truck bed and truck frame. If the truck is equipped with a safety stand delivery drivers will be allowed to work in-between the truck bed and frame only if the truck bed is empty.

Please report any unsafe conditions or unsafe acts that you observe to a member of CEMEX management. Continuous improvement is our goal and commitment.

No CEMEX equipment shall be used for contractor work without permission from the CEMEX supervisor in charge of such equipment. CEMEX equipment shall be operated by CEMEX personnel only, unless authorized by the site manager.

All oxygen, acetylene and other pressurized gas bottles belonging to contractors, vendors or visitors shall be secured at all times. When not in use, bottles should be capped.

Anyone entering this site will be required to observe the CEMEX Critical Safety Rules, including but not limited to the following:

| | |
|---|---|
| Lockout/Tagout/Tryout is required every time repair or maintenance of equipment is conducted | Walking or working under a suspended load is strictly forbidden |
| Working over 4 feet above a platform or surface without the use appropriate fall protection is strictly forbidden | Working on energized electrical equipment without properly rated and approved equipment, as required, is strictly forbidden |
| Operating mechanical equipment with guarding, safety latches or interlocks removed or disabled is strictly forbidden | Entering a Permit Required Confined Space without CEMEX management authorization is in violation of CEMEX Policy is strictly forbidden |
| Operating a piece of mobile equipment or vehicle without wearing a seat belt (if so equipped) is strictly forbidden | Using mobile equipment that has been identified as not having required and functional safety devices is strictly forbidden |